21-2573 United States v. Keita May it please the Court. Good morning. My name is Matthew Keller and I'm here today on behalf of the defendant in this case, Al-Seni Keita. This sentencing appeal presents two grounds of procedural unreasonableness. First, the sentencing court's loss determination under guideline 2B1.1b far exceeded the amount that could reasonably be attributed to him as relevant co-conspirator conduct. The way the sentencing court calculated its $305,000 loss amount here was to aggregate the total amounts deposited by any co-conspirator in the six bank accounts that Mr. Keita accessed. Essentially, the court attempted to connect Mr. Keita to the other members of the conspiracy that the two ringleaders of the conspiracy had recruited. The problem is, Your Honors, this was a hub and spoke conspiracy. At the center of the hub was the two ringleaders, Mr. Silla and the West African community here in New York, to take these hundreds of stolen checks that they had stolen through their work and deposit them in various bank accounts that they owned or controlled. In the absence of the rim around the wheel, the district court relied on many facts to find that it was reasonably foreseeable to Mr. Keita that all of these checks were deposited. The problem is, is that none of these reasons the court gave could substitute for the rim around the wheel. First of all, the court... What did you or what do you argue was the proper loss amount? Well, we argued before the sentencing court, before Judge Caproni, that the proper sentencing amount was the amount of checks that Mr. Keita deposited into his own account, which I believe amounted to approximately $5,000. And then to the amount, the checks that he was seeing deposited on bank surveillance, which amounted to, I guess, another $5,000 or $6,000 into the other accounts, the accounts of people other than Mr. Keita. Would that have changed his sentence? He got a below-guideline sentence. Very much below. Correct, Your Honor, but it would lower substantially the guidelines range that the court used before it varied downward to impose this sentence. And I think that's important, and it's certainly procedural sentencing. I'm sorry, Your Honor? Would it change Mr. Keita's sentence if the court used a different loss amount? Well, I think that's up to the court, but I think the court in its decision... Well, no, it's numbers. There's numbers involved, correct? Correct, Your Honor. On fraud cases? Yes, Your Honor. Okay, so if they used a different amount, would Mr. Keita's sentencing range be different? It would be substantially lower. So the court used a loss amount of $305,000, which brings him into Guideline 2B1.1b1. I believe that if they used our number, if they used $10,000 or $15,000, it would be substantially lower. The guidelines range... I'm sorry I didn't bring a sentencing table with me, but I believe that would put it... It would be more like zero to six. It would be something like that, Your Honor. That's why I started with the first question. I thought in your brief somewhere it indicated an appropriate loss amount was $105,000. No, Your Honor. The $105,000 comes to one of the factual errors the court made in this sentencing, which by itself we believe requires a remand. So our argument all along was if the court was going to take into account any deposits made into other accounts by other co-conspirators or checks where there was no evidence that Mr. Kita was involved, at the very least it shouldn't take into account the hundreds of checks deposited into those accounts that occurred before the first observation of Mr. Kita in March. So how much does that amount to? It amounts to $200,000. The court, as a way of insulating its sentence from review, I believe, said, okay, I'm finding a $305,000 loss amount. But even if I accept your view that all of these hundreds of checks that could not have been foreseen by Mr. Kita because he wasn't observed participating until after they were deposited, even if I take all those away, I would still impose the same sentence. And then the court said twice, that would lead me to remove $100,000 from my $305,000 loss amount. But when you look at the stipulation of facts that was before the court, it was a full $200,000, not $100,000, that would have been taken off had the court made that assumption. So I think that factual error was significant, and it highly undermines the confidence that this court can have that the court would have imposed the same sentence had it used the proper loss amount. But if you subtract $200,000 from $300,000, you're at $100,000. Then to return to Judge Poole, if that's the right loss amount, that's a guideline range of 15 to 21 months, which this sentence falls within. Right, but the judge still decided to vary downward from the applicable guideline range. And I don't think this court can have confidence that the court, if it was constrained to adopt a lower sentencing range, would say, well, you know what, then I'm not going to exercise my discretion to vary downwards because I want to give him this sentence. She did say this is the sentence that's correct, and she would apply it no matter what. Didn't she say that? Well, she didn't say no matter what, Your Honor. She said that even if I were to accept your argument that these pre-observation checks shouldn't be part of this loss amount, then I would take off $100,000. So that answers the question, though. She wouldn't have started from a different range? She thought this was the right sentence. I believe that's one reading of what she said. I believe that if she was going, as every judge here knows who sat as a sentencing judge, you start with the guidelines range, and then you either vary downward or vary upward. Here, the court decided that from the applicable guideline range, it's appropriate to vary downward. And I think had the court found a lower guidelines range, it still might have made the choice to vary downward. And more importantly, Judge Pooler, I think it's important to note that even that $100,000 amount was still too high. The reasons the court gave for attributing other co-conspirators' conduct to the loss amount here had really nothing to do with the activity that generated those loss amounts. So the court found, I think two of them bear repeating here. Of course, we discussed it in our brief. The court made a finding that given the pattern of ATM deposits, it didn't make sense that Mr. Kita would participate in the transactions that he was seen on surveillance participating in and then not have been a participant in other transactions. Other transactions the same day. Same bank. Except the loss amount isn't just limited to those. The court didn't tailor the loss amount accordingly to that reasoning. It still included all of the checks deposited over years into all those six accounts. So we believe that reasoning just fails to support even a small amount of the loss amount that the court found. And the other one is that Mr. Kita had to have seen the available balance in the ATMs. Now, I mean, obviously there's nothing in the record to support that. I don't think any of the surveillance video showed him taking an ATM receipt and looking at it. But even if he had done that, we all know we've all used ATMs. The balance reflected on an ATM receipt is not the sum total of the checks put into that account since the account was the inception of the account. It deposits less withdrawal. So even looking at that account balance, you don't have an idea of the total amount of checks that have been deposited in that account. And we do some math in the brief to show, using the stipulated spreadsheet of facts, how much the account balance would have shown. And it was significantly less than the $305,000 amount. The other reasons relied upon by the court do not in any way support the loss amount. The court relied on Mr. Kita's post-arrest statements to law enforcement, generally minimizing his conduct. Of course, that says nothing about how much was deposited in these accounts years before Mr. Kita was observed making a transaction. Thank you, Your Honor. Thank you, Your Honor. Mr. Bhatt. May it please the court, Assistant United States Attorney Kadar Bhatia for the United States. The sentencing court did not commit any error, let alone clear error, in calculating the loss amount attributable to Defendant Alseni Kita. Nor did the sentencing court commit any error when it carefully considered the relative cost of the transaction.  among other factors, and the need to avoid unwarranted sentencing disparities. I want to make a note- Were you trial counsel below? I was one of the AUSAs who charged the case. There was a prior trial that involved two other AUSAs, and there's an upcoming trial that's involving me. Oh, really? So it's not done, this case? There were two other defendants who were charged in the case who were scheduled to go to trial on June 6th. So I hate to use up your time, but I was very interested that the couriers stole these checks. What happens when the checks never arrived? So- Didn't anyone notice? To our surprise, the city of New York and the agency that was responsible for this didn't have an automatic system in place to take care of the checks that didn't arrive. If one of the landlords who was supposed to get the check complained, then there were some procedures in place to reissue the check. But there were 5,000 checks or more that were stolen right out of the mail and deposited as part of the scheme. And many of them were reissued, so the government paid twice? Many of these checks weren't actually issued, or there were chargebacks, and then I think some were reissued. So that would reduce the loss amount, wouldn't it, if they were not honored? Not necessarily, Your Honor. We accounted for the attempted loss here, which was what we calculated was the deposit of the checks is what we considered the loss. Even if it was later dishonored? That's right. It's an important part of the features of this case is that there were more than 5,000 checks deposited. The PSR reflects 3,000, but I think we later learned about even more, and other defendants took responsibility for all 5,000. But for only a few hundred of those deposits and then the subsequent withdrawals, was there actually ATM surveillance? So it was entirely reasonable for Judge Caproni, having recently sat through the trial of one of the couriers, to make reasonable estimates about how much each defendant who was involved in this scheme was actually responsible for. What was the total amount stolen? 3.5 million. And people didn't notice when the checks didn't come? Bureaucracy. Some of these oddities of trials as they go along. Okay, it's just mind-boggling to me. The restitution amount agreed to here is the same 305 and change figure, right? That's right. Does that have any bearing, stipulation to that, any bearing on the loss amount? I think that the defendant had challenged the restitution as well in their briefing and ultimately agreed to it. But the restitution, we think, has the same basis. So what do you make of the pre-involvement of the defendant? The inclusion of money in accounts pre-involvement of the defendant? Well, I'll say, Your Honor, Judge Caproni found that the defendant's involvement actually extended beyond just the account, That's important to note what I said earlier, which is that this was a case involving thousands of checks. In the six accounts Mr. Cato used alone, there were 863 deposits or withdrawals, and there was only surveillance for around 60 of those. I get that, but what about the pre-involvement? So Judge Caproni found that his involvement included some of those earlier deposits. Even though they weren't on surveillance? In those six accounts, it was reasonable for Judge Caproni to find that his involvement extended to more than just the checks where he was on surveillance, including the deposits and withdrawals before his first, the first surveilled instance. She also found, based on his contacts with the co-defendants and his sophistication, that all of these were foreseeable to him. Did he go to trial or was he, did he plead? He pleaded pursuant to a Pimentel letter. We also find that the judge made the particularized findings that were necessary based on the facts that were largely stipulated between the parties, or included in the PSR and not refuted by the defendant, and also based on her context, having recently sat through a trial from this defendant. Unless the court has any other questions. Are her conclusions, I mean, are those factual determinations? I know there wasn't a FATICO hearing on these questions, and she allocated specifically on that. She did. She offered the defendant a FATICO if he had any other facts to put in, or if he was contesting the facts that had already been stipulated to. The defendant did not ask for a FATICO and expressly turned down the opportunity. I do believe that the judge's findings here about his involvement, the extent of his knowledge, were factual findings and are entitled to the appropriate deference. What about Kida's argument here today in front of us that if the right amount or a lower amount was used, the district court would have had a different range to start from, and since she downwardly departed from the original range, we can assume that she might have downwardly departed even from the 15 to 21 months range. What about that? Is it useful for us to send it back to the district court to consider a newer range on a lower number? Well, I think here the judge's findings, of course, were sound, and we think that those were entitled to the appropriate deference. Judge Caproni asked defense counsel, what was the value of the checks that went into these accounts before the first surveillance? There was some miscommunication defense counsel didn't have the answer, and so Judge Caproni said, well, even if I reduce it by $100,000, she later clarified, even if I reduce it somewhat, it still wouldn't have an effect. So I don't think Judge Caproni made an erroneous finding, to be clear, and she also said it was well below the guidelines, which I think shows that she counted as she should and as she did, that the guidelines were just one of the many factors for her to consider. Thank you. Thank you, counsel. Thank you. Mr. Keller, you do have two minutes for a vote. Thank you, Your Honor. Just briefly, I just want to go in sort of reverse order. Judge Pooler, in response to your question about my argument before, how do we know what Judge Caproni would do? I would note that the sentencing guidelines range for the two defendants who the government agrees Mr. Keeter was most similarly situated to, Mr. Storey and Duqueray. They had guidelines ranges of 18 to 24 months and 12 to 18 months, respectively, and the court imposed time served sentences. So I think that's strong proof that a downward variance would be likely to occur here. Even with respect to Mr. Silla, who inexplicably got the same 18-month sentence as Mr. Keeter. He was the recruiter, wasn't he? All the checks, all the $3.5 million, got the same sentence as Mr. Keeter, who was seen on surveillance depositing about $12,000 in checks. So even he got a substantial downward variance from the range of 51 to 63 months. He got an 18-month sentence. So certainly if he's entitled to it, I think that there's a strong inference that Mr. Keeter would be entitled to a downward variance as well. One more point about the finding that Mr. Keeter participated in significantly more transactions than he was captured on surveillance. That's not the position the government took at Mr. Silla's sentencing, where it said to the court that the surveillance video was the, quote, best proxy for a member's culpability here. We cite that at our reply brief at page 9. And for one final point about the standard of review, we don't believe clear error applies. Because this is not a – clear error applies to the court's factual findings, but to the legal requirement that the court make particularized findings in support of its loss amount. That's a legal requirement that the court, we believe, failed pretty broadly here, and that should be reviewed de novo. And for all these reasons, we ask that the court remand for resentencing. Thank you, Mr. Keller. Thank you. That is the conclusion of our argued cases. We have one case on submission, and the last case we'll take under advisement. We're adjourned. I'll ask the clerk to adjourn the court. Will you please adjourn the court? Court is adjourned.